# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JESSE BARROSO,

        Plaintiff,

    v.

LIDESTRI FOODS, INC., et al.,

        Defendants.

Civil No. 11-2059 (NLH/AMD)

**OPINION**

**APPEARANCES:**

Daniel T. Silverman, Esquire
Kevin M. Costello, Esquire
Costello & Mains, P.C.
18000 Horizon Way
Suite 800
Mount Laurel, New Jersey 08054
    *Attorneys for Plaintiff Jesse Barroso*

Douglas Diaz, Esquire
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, New Jersey 08033
    *Attorney for Defendant Lidestri Foods, Inc.[1]*

**<u>HILLMAN, District Judge</u>**

    This matter comes before the Court by way of Defendant

Lidestri Foods, Inc.'s motion [Doc. No. 21] seeking summary

---

[1] Although Plaintiff's complaint also names Lidestri Foods
d/b/a Lidestri Food and Beverage, Lidestri Food and Beverage
d/b/a Lidestri Foods, Inc., and Lidestri Food and Beverage as
defendants in this case, the record reflects that Lidestri Foods,
Inc. is the proper Defendant and that these remaining names are
simply doing business as designations of Lidestri Foods, Inc.
(<u>See</u> Notice of Removal [Doc. No. 1] ¶ 3(d).)

judgment pursuant to Federal Rule of Civil Procedure 56.  The
Court has considered the parties' submissions and decides this
matter pursuant to Federal Rule of Civil Procedure 78.

For the reasons expressed below, Defendant's motion for
summary judgment will be granted.

**I.    <u>JURISDICTION</u>**

Plaintiff originally filed the complaint in this action in
the Superior Court of New Jersey, Camden County, Law Division
asserting claims of sexual harassment and retaliation in
violation of the New Jersey Law Against Discrimination ("NJLAD").
Defendant Lidestri Foods, Inc. ("Lidestri") removed the action to
this Court pursuant to 28 U.S.C. § 1441, <u>et</u> <u>seq.</u>, asserting
original jurisdiction exists over Plaintiff's state law claims
based on diversity of citizenship jurisdiction.

The Court exercises jurisdiction in this case pursuant to 28
U.S.C. § 1332 based on complete diversity of citizenship between
the parties and an amount in controversy in excess of $75,000.
Plaintiff Jesse Barroso is a citizen of the state of New Jersey.
(Notice of Removal [Doc. No. 1] ¶ 3(a).)  Lidestri is
incorporated in, and maintains its principal place of business
in, the state of New York.  (<u>Id.</u> ¶ 3(b).)  The amount in
controversy is met because the allegations contained in
Plaintiff's complaint sufficiently demonstrate that the damages
sought are in excess of $75,000, exclusive of interest and

costs.[2]

## II.   BACKGROUND

The basic facts of this case are largely undisputed and relate to Plaintiff's allegations that he was subjected to sexual harassment and retaliation during his employment at Lidestri.  In November of 2008, Plaintiff was hired to work for Lidestri as a forklift operator at its Pennsauken, New Jersey manufacturing

---

[2] The complaint also names Roger Carter, as a Defendant. (First Am. Compl. [Doc. No. 16] ¶ 3.)  From the complaint and Lidestri's Notice of Removal, it appears that Defendant Roger Carter is potentially a citizen of the state of New Jersey.  (See id.; see also Notice of Removal ¶ 3(e).)

Section 1441(b)(2) of the removal statutes prohibits removal of civil actions "solely on the basis" of diversity jurisdiction "if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."  28 U.S.C. § 1441(b)(2).  Under Section 1441(b)(2), known as the forum defendant rule, "a state court action is not removable based upon diversity jurisdiction if any of the 'properly joined and served' defendants are citizens of the forum state."  Poznanovich v. AstraZeneca Pharmaceuticals LP, No. 11-4001, 2011 WL 6180026, at *1 (D.N.J. Dec. 12, 2011).

Lidestri asserts, however, that removal remains proper in this case and is not barred by Section 1441(b)(2) because Carter had not yet been served with the complaint at the time of removal.  (Notice of Removal ¶ 3(e).)  A split of authority on the issue of "whether removal by a non-forum defendant prior to formal service on any defendant, including forum defendants, is valid" exists among the courts in this District.  See Poznanovich, 2011 WL 6180026, at *3-5 (collecting cases).

However, the Court need not resolve this issue because it appears that Plaintiff does not intend to pursue any claims against Carter.  He was not served within 120 days of the filing of the complaint as required by Federal Rule of Civil Procedure 4(m), and it appears that Plaintiff has abandoned any claims asserted against him in this action and is proceeding only against the corporate defendant, Lidestri.  Accordingly, pursuant to Rule 4(m), the Court dismisses Plaintiff's action against Carter and his citizenship will not be considered for purposes of diversity jurisdiction.

facility.  (Lidestri's Statement of Undisputed Material Facts
[Doc. No. 21-3] (hereinafter, "Lidestri's Statement"), ¶¶ 1-2;
Pl.'s Reply to Def.'s Statement of Undisputed Material Facts
[Doc. No. 24-1] (hereinafter, "Pl.'s Statement"), ¶¶ 1-2.)
Lidestri's Pennsuaken facility consists of two separate
buildings: a warehouse building known, as the "1600 Building,"
and a production building where the receiving dock was located,
known as the "1550 Building."  (Lidestri's Statement ¶ 1; Pl.'s
Statement ¶ 1.)

During the course of his employment, Plaintiff worked in the
receiving area of the 1550 Building.  (Lidestri's Statement ¶ 2;
Pl.'s Statement ¶ 2.)  In the fall of 2010, the time period
relevant to this action, Plaintiff worked the second shift at the
1550 Building from Monday through Friday.[3]  (Lidestri's Statement
¶ 20; Pl.'s Statement ¶ 20.)  Near the end of September 2010, a
warehouse shift manager at Lidestri by the name of Michael Shaw
began working the second shift on both Thursday and Fridays.
(Lidestri's Statement ¶¶ 14, 19; Pl.'s Statement ¶ 14, 19.)
Shaw's primary responsibility at Lidestri was oversight of the
1600 Building where his office was located.  (Lidestri's
Statement ¶ 15; Pl.'s Statement ¶ 15.)  However, while working

---

[3] Lidestri alleges that in November of 2010, Plaintiff's
schedule changed and he no longer worked on Fridays.  (Lidestri's
Statement ¶ 21.)  Plaintiff disputes that his schedule changed in
November of 2010.  (Pl.'s Statement ¶ 21.)  This dispute is not
material to the instant motion.

the second shift Shaw "would see the employees in the 1550 [B]uilding maybe two or three times a day in passing just to ensure the employees were performing their assigned tasks." (Lidestri's Statement ¶ 22; Pl.'s Statement ¶ 22.)

On December 13, 2010, Kathleen Jehens, Lidestri's Human Resources Manager at the Pennsuaken facility, received a letter from another forklift driver, Hosmay Jorrin, complaining of sexual harassment by Shaw.  (Lidestri's Statement ¶¶ 39-43; Pl.'s Statement ¶¶ 31, 38; see also Undated Letter from Hosmay Jorrin, Ex. 8 to Lidestri's Statement, 1.)  Plaintiff, along with several other Lidestri employees, signed the letter Jorrin submitted complaining of Shaw's conduct.  (Lidestri's Statement ¶ 39, Pl.'s Statement 39.)  Upon receipt of Jorrin's letter on December 13, 2010, Jehens began an internal investigation into Plaintiff's allegations against Shaw commencing the following morning on December 14, 2010.[4]  (Lidestri's Statement ¶ 40; Pl.'s Statement ¶ 40.)  Moreover, Lidestri immediately removed Shaw from his duties as a warehouse shift manager in the 1550 Building after receipt of Jorrin's letter.[5]  (Lidestri's Statement ¶ 41; Pl.'s

_____

[4] Jehens apparently commenced the investigation on December 14, 2010 because she did not receive Plaintiff's letter until late in the afternoon on December 13, 2010 at approximately 4:45 p.m.  (Ex. 1 to Lidestri's Statement, Certification of Jehens ¶ 13; Lidestri's Statement ¶ 38; Pl.'s Statement ¶ 38.)

[5] The record reflects that Lidestri in fact decided to suspend Shaw's employment during the course of the internal investigation beginning on December 14, 2010.  (Ex. 10 to

Statement ¶ 41.)

    Jehens' investigation consisted of interviews of ten Lidestri employees from December 14, 2010 through December 21, 2010, including Plaintiff and Shaw.  (Lidestri's Statement ¶¶ 42-46; Pl.'s Statement ¶¶ 42-46.)  With respect to Plaintiff's complaints of sexual harassment by Shaw, Jehens' investigation and interview of Plaintiff revealed that Shaw's conduct toward Plaintiff included the following: (1) comments Shaw made to Plaintiff such as "hurry up before I snatch your balls" or "before I grab [your penis]"; (2) Shaw referring to Plaintiff as "pumpkin" or "hon" rather than by his name; (3) Shaw touching Plaintiff's leg or shoulder while speaking to Plaintiff; (4) Shaw rubbing his own nipples with his shirt on; (5) Plaintiff hearing Shaw tell a different male employee that Shaw wanted "to grab [the employee's] boobs"; and (5) Plaintiff observing Shaw touch Jorrin's shoulder while telling Jorrin he had a "sexy accent". (Lidestri's Statement ¶ 25; Pl.'s Statement ¶ 25.)  Plaintiff later testified that although he initially thought Shaw was just joking, he later felt "uncomfortable" with Shaw's conduct but was still able to perform his job duties despite Shaw's behavior. (Lidestri's Statement ¶¶ 26-27; Pl.'s Statement ¶¶ 26-27.)

    After Jehens completed her investigation, she advised Jane Oca, Lidestri's Corporate Human Resources Manager, of what the

_____

Lidestri's Statement, Tr. of Oca's Dep. 26:18-27:7.)

employees reported in the interviews.  (Lidestri's Statement ¶ 53; Pl.'s Statement ¶ 53.)  Oca then discussed the matter with Lidestri's Vice-President, Donna Yanicky, and the Director of the Warehouse, Lee Biscardi, who collectively decided to terminate Shaw's employment.  (Lidestri's Statement ¶ 54; Pl.'s Statement ¶ 54.)  Shaw was terminated from Lidestri on December 22, 2010, approximately eleven (11) days after Jehens first received Jorrin's letter.  (Lidestri's Statement ¶ 55; Pl.'s Statement ¶ 55.)

Following Shaw's termination, another warehouse shift manager at Lidestri, specifically Michael DiMaio, became Plaintiff's shift manager for a couple of hours during the day. (Lidestri's Statement ¶ 56; Pl.'s Statement ¶ 56.)  Plaintiff claims that almost immediately after his complaint of sexual harassment to Human Resources, DiMaio started retaliating against Plaintiff by: (1) on one occasion taking Plaintiff's forklift and instructing Plaintiff to get another one; (2) making statements to other employees requesting that they watch what Plaintiff was doing and let DiMaio know; (3) using curse words when speaking to Plaintiff; (4) instructing Plaintiff on one occasion to go "break bins" although this was not part of Plaintiff's typical job duties; (5) by requesting Plaintiff perform someone else's job; and (6) giving Plaintiff a write-up after Plaintiff failed to work on a Saturday when he was told to report.  (Lidestri's

Statement ¶ 57; Pl.'s Statement ¶ 57.)

Based on these facts, Plaintiff brings a two count complaint asserting claims for sexual harassment and retaliation in violation of the NJLAD.  As to his claim for sexual harassment, Plaintiff alleges he was "exposed to purposeful and egregious sexual harassment, combined with willful indifference on the part of upper management and/or participation on the part of management" such that Lidestri is responsible for Shaw's conduct. (First Am. Compl. ¶¶ 24-25.)  Plaintiff further claims that he engaged in protected conduct under the NJLAD by complaining of Shaw's conduct, which was a determinative and motivating factor in him being targeted and disciplined by Lidestri.  (<u>Id.</u> ¶ 28a-29a.)

## III. <u>DISCUSSION</u>

### A.   **Summary Judgment Standard**

In the present motion, Lidestri seeks the entry of summary judgment in its favor on all of Plaintiff's claims under the NJLAD.  Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56).

8

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'"  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." (citation omitted); see also Singletary v. Pa. Dept. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the

moving party may be discharged by "showing" -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.") (citing Celotex, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 324.  A "party opposing summary judgment may not rest upon the mere allegations or denials of the ... pleading[s.]" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (internal quotations omitted).  For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  Cooper v. Sniezek, 418 F. App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322 ).  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57.

**B.   NJLAD Sexual Harassment Hostile Environment Claims**

As the New Jersey Supreme Court has long recognized, "New Jersey has a strong interest in maintaining 'discrimination-free

workplace[s]' for workers." Cutler v. Dorn, 955 A.2d 917, 923 (N.J. 2008) (citing Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 452 (1993)).  The NJLAD makes it an unlawful

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex ... of any individual, ... to refuse to hire or employ or to bar or to discharge ... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

Lehmann, 626 A.2d at 452 (citing N.J. STAT. ANN. § 10:5-12(a)).[6]

More recently the New Jersey Supreme Court reiterated that "the basic requirements for determining whether workplace acts of sexual harassment constitute prohibited discrimination under the LAD" were established in Lehmann.  Cutler, 955 A.2d at 924. Specifically, the New Jersey Supreme Court requires a plaintiff claiming a hostile workplace based on acts of sexual harassment to prove that

> the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.

---

[6] The current version of Section 10:5-12(a) now also prohibits discrimination or harassment based on civil union status, domestic partnership status, genetic information, gender identity or expression, and disability.  N.J. STAT. ANN. § 10:5-12(a) (West 2013).

Cutler, 955 A.2d at 924 (citing Lehmann, 626 A.2d at 453).[7]

---

[7]Citing to Lehmann, Lidestri argues that to establish a hostile work environment claim under the NJLAD a plaintiff "must prove: (1) he suffered intentional discrimination which would not have occurred but for his gender, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected him, (4) the discrimination would detrimentally affect a reasonable person of similar gender in the position, and (5) the existence of respondeat superior liability."  (Br. of Def. Lidestri Foods, Inc. in Supp. of its Mot. for Summ. J. [Doc. No. 21-1] (hereinafter, "Def.'s Br."), 8-9.)

The Court notes that the elements recited by Lidestri are not actually the elements delineated by the New Jersey Supreme Court in Lehmann.  It appears that Lidestri is relying on a formulation of the elements required for a sexual harassment hostile work environment claim brought under Title VII of the Civil Rights Act announced by the Third Circuit in Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).  However, in Lehmann, the New Jersey Supreme Court, "[r]ather than risking confusion by engrafting major revisions to the Andrews test, ... announce[d] a new test" with respect to sexual harassment hostile work environment claims.  626 A.2d at 453.

In Lehmann, the Court expressly rejected Andrews' requirement that a plaintiff show the employer's discrimination or harassment was intentional.  Id. at 454 ("The LAD is not a fault- or intent-based statute.  A plaintiff need not show that the employer intentionally discriminated or harassed her, or intended to create a hostile work environment.")  The Court also explicitly considered but abandoned that portion of Andrews which examined a plaintiff's subjective viewpoint of the alleged harassment and opted instead for an objective standard.  Id. at 457-58 ("[W]e choose an objective rather than a subjective viewpoint because the purpose of the LAD is to eliminate real discrimination and harassment."); see also Cutler, 955 A.2d at 924 ("[N]either 'a plaintiff's subjective response' to the harassment,... nor a defendant's subjective intent when perpetrating the harassment, ... is controlling of whether an actionable hostile environment claim exists.  Whether harassing conduct makes a work environment hostile is assessed by use of a reasonable person standard.")

Lidestri also relies on Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999) for the proposition that Plaintiff must establish the existence of respondeat superior liability on his sexual harassment claim, but the Court notes that this element similarly stems from the Third Circuit's holding in Andrews.  However, the New Jersey Supreme Court has held "that

12

Although the <u>Lehmann</u> standard is couched in terms of a

"reasonable woman" — the relevant consideration in the majority

of cases — the standard clearly "applies to sexual harassment of

women by men, men by women, men by men, and women by women.  The

LAD protects both men and women and bars both heterosexual and

homosexual harassment."  626 A.2d at 454.  Thus, when the

plaintiff is male, as is the case here, the only difference in

the standard is that a male plaintiff must "allege conduct that a

reasonable man would believe altered the conditions of his

employment and created a working environment that was hostile to

men."  <u>Id.</u>

**B.   Retaliation Under the NJLAD**

Under the NJLAD, "it is unlawful to 'take reprisals against

any person because that person has opposed any practices or acts

forbidden under the [LAD].'"  <u>Young v. Hobart West Group</u>, 897

A.2d 1063, 1072 (N.J. Super. Ct. App. Div. 2005) (citing N.J.

Stat. Ann. § 10:5-12d).  As recognized by the New Jersey Supreme

---

employer liability for supervisory hostile work environment
sexual harassment [under the NJLAD] shall be governed by agency
principles."  Lehmann, 626 A.2d at 461.  Accordingly, "an
employer whose supervisory employee is acting within the scope of
his or her employment will be liable for the supervisor's conduct
in creating a hostile work environment" as well as those
situations where the "supervisor is acting outside the scope of
his or her employment," but the supervisor's behavior falls
within one of the exceptions outlined by Section 219(2) of the
Restatement (Second) of Agency.  Id. at 462.
     Thus, to the extent Lidestri asserts arguments inconsistent
with New Jersey law, the Court disregards those arguments in
ruling on the present motion.

Court,

> the protection against retaliation embodied in
> the LAD is broad and pervasive, and must be seen
> as necessarily designed to promote the integrity
> of the underlying antidiscrimination policies of
> the Act by protecting against reprisals "any
> person" who has sought to protect his or her own
> rights not to be discriminated against or who has
> acted to support such conduct.

Quinlan v. Curtiss-Wright Corp., 8 A.3d 209, 221 (N.J. 2010)

(citing Craig v. Suburban Cablevision, Inc., 644 A.2d 112 (N.J.

Super. Ct. App. Div. 1994), aff'd, 660 A.2d 505 (1995)).

To establish a prima facie case for retaliation under the

NJLAD, a "plaintiff must demonstrate: (1) that [plaintiff]

engaged in protected activity; (2) the activity was known to the

employer; (3) plaintiff suffered an adverse employment decision;

and (4) there existed a causal link between the protected

activity and the adverse employment action." Young, 897 A.2d at

1072 (citing Craig, 660 A.2d at 508). Significantly, "'[t]he

central element of a [retaliation] claim under the LAD is that

the plaintiff "be engaged in a protected activity, which is known

by the alleged retaliator."'" Mancuso v. City of Atlantic City,

193 F. Supp. 2d 789, 811 (citing Erickson v. Marsh & McLennan

Co., Inc., 569 A.2d 793, 803 (1990)); see also Montalvo v. New

Jersey, 2011 WL 677251, at *5 (N.J. Super. Ct. App. Div. Feb. 28,

2011.)[8]

---

[8] Although Erickson was a case involving a claim for
retaliatory discharge, both state and federal courts in New

After a plaintiff satisfies its burden to establish a prima facie case, "the defendant[] must 'articulate a legitimate, non-retaliatory reason for the [adverse employment] decision." Young, 897 A.2d at 1072-73 (citing Romano v. Brown & Williamson Tobacco Corp., 665 A.2d 1139, 1142 (N.J. Super. Ct. App. Div. 1995)).  Upon defendant's proffer of a legitimate, non-retaliatory reason for the challenged adverse employment decision, "the plaintiff must come forward with evidence of a discriminatory motive of the employer, and demonstrate that the legitimate reason was merely a pretext for the underlying discriminatory motive."  Romano, 665 A.2d at 1142.

## IV. <u>ANALYSIS</u>

Lidestri argues that summary judgment is appropriate in this case because: (1) Plaintiff has failed to demonstrate that the conduct at issue on his sexual harassment claim was sufficiently severe or pervasive enough to make a reasonable man believe the conditions of his employment were altered and the working environment was hostile or abusive; (2) Lidestri may not be held vicariously liable for its employee's conduct; and (3) Plaintiff has failed to establish a prima facie case of retaliation.

---

Jersey have applied the concept of "known by the alleged retaliator" in cases asserting general retaliation claims, such as this, even in the absence of a retaliatory termination claim. <u>See</u> Mancuso, 193 F. Supp. 2d at 811; Montalvo, 2011 WL 677251, at *5.

## A.    Sexual Harassment Hostile Environment Claim

*Lidestri's Liability as Plaintiff's Employer*

Even assuming that Shaw's conduct was sufficiently serve or pervasive enough in this case to make a reasonable man believe the conditions of employment were altered and the working environment was hostile,[9] Plaintiff has failed to demonstrate a

---

[9] Lidestri argues that Shaw's conduct was not objectively severe or pervasive such that a reasonable man would have believed that the conditions of his employment were altered and the working environment was hostile or abusive.  (Id.); see Lehmann, 626 A.2d at 453-54.

Assessing whether the alleged harassing conduct is severe or pervasive, requires an examination of the totality of the circumstances as opposed to consideration of each incident in isolation.  Cutler, 955 A.2d at 924.  Here, the Court "must consider the cumulative effect of the various incidents, bearing in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes."  Lehmann, 626 A.2d at 455 (citations and internal quotations omitted).  Under this standard, it is "the cumulative impact of separate successive incidents that cements the hostile work environment."  Cutler, 955 A.2d at 925.

In evaluating severity or pervasiveness the Court considers the nature of the conduct itself, "rather than the effect of the conduct on any particular plaintiff."  El-Sioufi v. St. Peter's Univ. Hosp., 887 A.2d 1170, 1190 (N.J. Super. Ct. App. Div. 2005).  Thus, "whether an environment is hostile or abusive can be determined only [by] looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance."  El-Sioufi, 887 A.2d at 1190 (citations and internal quotations omitted).

We consider this issue a close call.  First, we note that the defendant certainly considered it severe enough to terminate Shaw.  On the one hand, much of Shaw's conduct was verbal in nature and could be fairly described as teasing or off-hand remarks.  In this regard, it is important to note though that "not every offensive remark, even if direct, is actionable. ... epithets or comments which are merely offensive will not

genuine issue of material fact exists supporting the imposition

of vicarious liability on Lidestri for Shaw's conduct and thus

Lidestri is entitled to summary judgment on Plaintiff's sexual

harassment hostile work environment claim.  Plaintiff makes two

arguments relevant to Lidestri's liability asserting first that

Lidestri is vicariously liable for Shaw's actions because Shaw

was a supervisor capable of controlling Plaintiff's work

environment.  (Pl.'s Opp'n 4.)  Additionally, Plaintiff contends

Lidestri is liable for its "failure to publish and train upon an

---

establish a hostile work environment claim." El-Sioufi, 887 A.2d
at 1190 (citations and internal quotations omitted).  The NJLAD
"is not intended to be a 'general civility code' for conduct in
the workplace ... Discourtesy or rudeness should not be confused
with ... harassment, and a 'lack of ... sensitivity' does not,
alone, amount to actionable harassment.  Thus, 'simple teasing,'
offhand comments, and isolated incidents (unless extremely
serious) will not amount to discriminatory changes in the 'terms
and conditions' of employment." Heitzman v. Monmouth Cnty., 728
A.2d 297, 304 (N.J. Super. Ct. App. Div. 1999), overruled on
other grounds, Cutler, 955 A.2d 917(2008).  That having been
said, "in certain circumstances, even a single [incident] can be
so severe as to pollute the work environment, rendering it
irretrievably hostile." Cutler, 955 A.2d at 925 n.7.  While it
does not appear that Shaw's actions interfered with Plaintiff's
ability to perform his job duties, his conduct exceeded mere off-
handed comments.  In addition to repeated, unexplained, and
potentially offensive touching of the Plaintiff's shoulder and
leg, Shaw also touched himself in a sexually suggestive way.
Moreover, the content of his remarks were sexually explicit,
referred to Plaintiff's genitalia, and attributed female
characteristics to a male co-worker.  In addition, this behavior
was observed by others and occurred in conjunction with sexually
offensive conduct by Shaw toward another employee.  We are unable
to conclude that the totality of these circumstances here are not
sufficiently severe and pervasive as a matter of law. In any
event, because Lidestri has presented sufficient evidence
demonstrating it cannot be held vicariously liable for Shaw's
conduct, we need not resolve this issue.

effective [anti-sexual harassment] policy for all employees."
(Id.)

### (i)   Whether Shaw Qualifies as a Supervisor

An employer's liability under the NJLAD for claims related to sexual harassment by a supervisor is largely dependant upon the facts of a particular case. Lehmann, 626 A.2d at 464. Generally, an employer can be held vicariously liable for conduct of a supervisor where the supervisor acted within the scope of his or her employment. Id. Additionally, in the more common situation where the supervisor acted outside the scope of his or her employment, the employer can be held vicariously liable "if the employer contributed to the harm through its negligence, intent, or apparent authorization of the harassing conduct, or if the supervisor was aided in the commission of the harassment by the agency relationship." Id.; see also Herman v. Coastal Corp., 791 A.2d 238, 251 (N.J. Super. Ct. App. Div. 2002) (explaining that an employer cannot be held liable for sexual harassment under the NJLAD "in the absence of a showing that the harassing employee was acting within the scope of his employment, or that the employer was negligent, or had intended the conduct.")

Thus, as explained by the New Jersey Supreme Court in Lehmann, "an employer can be held liable for compensatory damages stemming from a supervisor's creation of a hostile work environment" in one of three circumstances: (1) where "the

employer grants the supervisor the authority to control the
working environment and the supervisor abuses that authority to
create a hostile work environment[;]" or (2) where "the employer
ha[s] actual or constructive notice of the harassment[;]" or (3)
where, in the absence of actual or constructive notice, "the
employer negligently or recklessly failed to have an explicit
policy that bans sexual harassment and that provides an effective
procedure for the prompt investigation and remediation of such
claims."  626 A.2d at 464.

"A supervisor has a unique role in shaping the work
environment.  Part of a supervisor's responsibilities is the duty
to prevent, avoid, and rectify invidious harassment in the
workplace."  Herman, 791 A.2d at 252.  Determining precisely
which employees qualify as supervisors "for purposes of vicarious
liability for compensatory damages" depends upon the "functional
assignments" those employees maintain in the workplace.  Cavuoti
v. New Jersey Transit Corp., 735 A.2d 548, 558 (1999).  Moreover,
the use of "a mere title of 'manager' or 'supervisor' does not by
itself suffice to impute that employee's knowledge or actions to
the employer."  Id. at 557-58.  Putting aside arbitrary position
titles utilized by any given employer then, generally "a
supervisor has the authority to hire, fire, discipline, control
employees' wages or control employees' schedules."  Herman, 791
A.2d at 254 (citing Cavuoti, 735 A.2d at 558).  As recognized by

New Jersey courts, "[a]n employer is generally liable for a
hostile work environment created by a supervisor because the
power an employer delegates to a supervisor 'to control the
day-to-day working environment' facilitates harassing conduct."
Herman, 791 A.2d at 254 (citation omitted); see also Lehmann, 626
A.2d at 462.

To determine whether an offending employee qualifies as a
supervisor, the Court must consider "whether the power the
offending employee possessed was reasonably perceived by the
victim, accurately or not, as giving that employee the power to
adversely affect the victim's working life."  Entrot v. BASF
Corp., 819 A.2d 447, 459 (N.J. Super. Ct. App. Div.2003).
Relevant factors in this determination include the power to fire
or demote, the power to direct job functions, and any evidence
that the alleged harasser possessed influence to control the
workplace or restrict the alleged victim's freedom to ignore the
complained-of conduct.  Id.

Here, Plaintiff has failed to establish that a genuine issue
of material facts exists from which a jury could find that Shaw
qualifies as a "supervisor" under the NJLAD for purposes of
holding Lidestri vicariously liable for his conduct.  Although
Shaw's job title was that of a warehouse shift manager, the
record demonstrates that Shaw did not have any independent

authority or power to hire, fire, or demote Plaintiff,[10] to set Plaintiff's schedule,[11] or to exercise control over Plaintiff's wages or any other form of compensation Plaintiff received.  The record also establishes that Shaw possessed no independent authority to discipline Plaintiff, or any employees, but could only do so with the approval of Roger Carter.  (Ex. 7 to Lidestri's Statement, Tr. of Shaw's Dep. 15:15-18.)  This evidence leaves no genuine issue of material fact from which a jury could reasonably conclude that Plaintiff actually perceived Shaw as a supervisor who possessed power to adversely affect Plaintiff's work environment.

It is also undisputed that Shaw's main responsibility was oversight of the 1600 Building where his office was located, and that he only came by the 1550 Building where Plaintiff worked approximately two or three times a day in passing to ensure that the employees were completing their assignments.  Accordingly, the record reflects that Shaw did not possess any notable degree

---

[10] In this regard, the record makes clear that decisions regarding terminations and demotions were handled by Jehens in Human Resources with the guidance or approval of Oca, the Corporate Human Resources Manager.  Shaw himself testified that he only "sat in on the hiring process" but apparently did not independently make final personnel decisions.  (Ex. 7 to Lidestri's Statement, Tr. of Shaw's Dep. 15:21-23.)

[11] Shaw testified that he was not responsible for scheduling employee shifts but rather "just [for] supervising to make sure all the daily activities were being completed."  (Ex. 7 to Lidestri's Statement, Tr. of Shaw's Dep. 15:8-12.)

of control over Plaintiff's day-to-day work environment in the 1550 Building particularly where Plaintiff only worked with Shaw two days a week on Thursdays and Fridays.  No reasonable jury could infer that these infrequent, minimal, and momentary "passing through" visits twice a week amounted to day-to-day control over Plaintiff's working environment in the 1550 Building.

To the extent Plaintiff perceived Shaw as possessing some sort of power over Plaintiff, this perception certainly did not restrict Plaintiff's freedom and ability to ignore and disapprove of Shaw's conduct.  Specifically, Plaintiff testified at his deposition that he typically responded to Shaw's conduct by indicating his disapproval, informing Shaw that his actions made Plaintiff uncomfortable, and asking Shaw to stop.  (See Ex. 2 to Lidestri's Statement, Tr. of Pl.'s Dep. 57:2-4.)

Plaintiff, as the party opposing summary judgment on this issue, is required to identify specific facts and affirmative evidence that contradict those offered by Lidestri.  Plaintiff has failed to do so here arguing only that "the harassment was in fact conducted by a supervisor, that same supervisor was aware of his own conduct" and "[t]hus, Defendant had knowledge of the same through its agents to whom they delegated responsibility." (Pl.'s Br. 9.)  The New Jersey Supreme Court has expressly rejected Plaintiff's argument and held that "a mere title of

22

'manager' or 'supervisor' does not by itself suffice to impute that employee's knowledge or actions to the employer." Cavuoti, 735 A.2d at 558. To impose liability on Lidestri for Shaw's conduct, Plaintiff was required to demonstrate more. He has failed to do so and thus Lidestri is entitled to summary judgment on Plaintiff's sexual harassment claim because Shaw does not qualify as a supervisor under the NJLAD.

*(ii) Maintenance of an Anti-Harassment Policy*

As an alternative basis for liability, Plaintiff argues that Lidestri negligently failed to publish and train upon an effective anti-sexual harassment policy for all employees. (Pl.'s Br. 4.) Under New Jersey law, courts "adhere to the principle that if an employer has exercised due care in acting to prevent a sexually discriminatory hostile work environment, vicarious liability should not attach. The establishment of an effective anti-sexual harassment workplace policy and complaint mechanism evidences an employer's due care and may provide affirmative protection from vicarious liability." Gaines v. Bellino, 801 A.2d 322, 323 (N.J. 2002); see also Cavuoti, 735 A.2d at 556 (recognizing that New Jersey law "afford[s] a form of a safe haven [from vicarious liability for the harassing conduct of an employee] for employers who promulgate and support an active, anti-harassment policy.")

In order for an employer to enjoy the benefit of that safe

haven from vicarious liability based on maintaining an active anti-harassment policy, the following circumstances are "relevant: periodic publication of the employer's anti-harassment policy, the presence of an effective and practical grievance process for employees to use, and training for workers, supervisors, and managers concerning how to recognize and eradicate unlawful harassment." Gaines, 801 A.2d at 330 (citing Cavuoti, 735 A.2d at 556).

Additionally, "[a]n employer has a clear duty not only to take strong and aggressive measures to prevent invidious harassment, but also to correct and remediate promptly such conduct when it occurs." Herman, 791 A.2d at 252 (citing Payton v. New Jersey Turnpike Auth., 691 A.2d 321, 327-28 (1997)). As the New Jersey Supreme Court noted in Gaines, "[t]he efficacy of an employer's remedial program is highly pertinent to an employer's defense" that its actions absolve it from all liability for a plaintiff's claims. 801 A.2d at 330 (citing Payton, 691 A.2d at 327). "'[E]ffective' remedial measures ... include the process by which the employer arrives at the sanctions that it imposes on the alleged harasser" and are reviewed in light of the "investigation—including [its] timeliness, thoroughness, [the] attitude toward the allegedly harassed employee, and the like—as well as by the result[.]" Payton, 691 A.2d at 327.

24

Plaintiff relies on <u>Gaines</u> for the proposition that the mere existence of an anti-harassment policy alone is insufficient to defeat a harassment claim, particularly on summary judgment. (Pl.'s Br. 8.)  Plaintiff contends that in this case "there clearly exist genuine issues of material fact as to whether Defendant implemented an effective anti-harassment policy." (<u>Id.</u>)  As an initial matter, Plaintiff argues that there was "no 'unequivocal commitment from the top in this matter'" to demonstrate that Lidestri's policies against sexual harassment were more than mere words, but were backed up by consistent practice.  (<u>Id.</u>)  Plaintiff specifically relies on the fact that the complained-of conduct here came from a member of management and that other members of management were aware of Plaintiff's allegations and did not report the allegations.[12]   (<u>Id.</u> at 8-9.) Plaintiff also argues that Lidestri never conducted any classes, seminars, trainings, or other instructional opportunities for non-managerial employees, like Plaintiff, regarding the company's policies.  (<u>Id.</u> at 9.)  Finally, Plaintiff points to the fact

---

[12] In his attempt to argue that there was no commitment from the top to enforce Lidestri's policies, Plaintiff notes that Roger Valladares was purportedly terminated for his failure to report allegations of sexual harassment based on Shaw's conduct. Rather than establishing that Lidestri's policies were mere words, Plaintiff's argument actually supports the notion that Lidestri backed up its policies in practice, taking sexual harassment allegations so seriously that the company not only terminated the alleged harasser, Shaw, but also a member of management who failed to timely report alleged sexual harassment.

that Lidestri's policies were revised after Plaintiff was hired but that he never received an updated version of the policy. (Id.)

Despite Plaintiff's arguments, the Court finds that there is no evidence in this case demonstrating that Lidestri's policies were merely words. Rather, it is undisputed that Lidestri maintains both a "Sexual Harassment" policy which expressly prohibits sexual discrimination or harassment, and a broader "Non-Harassment" policy, both of which are set forth not only in the employee handbook, but are separately provided to new employees at the time they are hired by Lidestri. (Lidestri's Statement ¶¶ 3-4, 8; Pl.'s Statement ¶¶ 3-4, 8.) Both of these policies are specifically reviewed with employees as part of their new employee orientation,[13] and employees are required to sign off on receipt of both policies. (Lidestri's Statement ¶¶ 5-6; Pl.'s Statement ¶ 6.) Plaintiff concedes that at the time he was hired, he signed both of Lidestri's policies.[14]

---

[13] In an attempt to dispute this fact, Plaintiff points to the deposition of Jehens to argue that she had no knowledge of any training Plaintiff received. A review of the deposition testimony relied on by Plaintiff, however, demonstrates only that Jehens could not recall being present at any training for Plaintiff. (Ex. A to Pl.'s Statement, Tr. of Jehens' Dep. 23:4-10.)

[14] Plaintiff later testified that he did not recall receiving the Sexual Harassment Policy but acknowledged that he signed it a copy of it on November 17, 2008. (See Ex. 2 to Lidestri's Statement, Tr. of Pl.'s Dep. 78:24-79:9; see also Ex. 4 to Lidestri's Statement, Sexual Harassment Policy signed by

(Lidestri's Statement ¶ 7; Pl.'s Statement ¶ 7.)

The Sexual Harassment policy provides for a reporting
mechanism regarding complaints whereby "[e]mployees who believe
they have been the subject of sexual harassment should report
their charge immediately to any supervisor or Jane Oca in the
Human Resources Department" and Oca's contact information is
readily accessible on the company website, and was so in 2010.
(Lidestri's Statement ¶¶ 9-10; Pl.'s Statement ¶¶ 9-10.)  The
Sexual Harassment policy further explains that Lidestri will
promptly and throughly investigate all complaints.  (Lidestri's
Statement ¶ 11; Pl.'s Statement ¶ 11.)

In the face of this evidence the Court finds that this case
is distinguishable from <u>Gaines</u>, where several issues of disputed
facts were present, and that no reasonable jury could conclude
that Defendant did not have an adequate anti-harassment policy in
place.  Lidestri made periodic publication of its policies
available to employees through the hiring and orientation
process; Plaintiff signed off on receipt of the policies and
testified that he understood that he could file a complaint with
Human Resources if he believed he was being sexually harassed,
(<u>see</u> Lidestri's Statement ¶ 30; Pl.'s Statement ¶ 30); presented
employees with a practical and effective grievance process for
reporting complaints to any supervisor or member of the Human

---

Plaintiff.)

Resources Department in the company; by providing employees a
certain degree of training and review of the policy during
orientation; and by providing supplemental training on the
relevant policies to supervisors and management employees.

Furthermore, the Court must consider the efficacy of
Lidestri's remedial program because it is highly pertinent to
Lidestri's defense that its actions absolve it from liability
here.  In this regard, the record evidence demonstrates that as
soon as Jorrin's complaint letter was brought to the attention of
the company on December 13, 2010, Lidestri took swift and
thorough action to investigate Plaintiff's allegations, as well
as Jorrin's, and put a stop to Shaw's conduct.  Specifically,
Lidestri received the letter on December 13, 2010 at 4:45 p.m.,
through Jehens, its top Human Resource official at the Pennsuaken
facility.  The following morning, Jehens began an internal
investigation of Plaintiff's allegations against Shaw, and
Lidestri suspended Shaw immediately pending the outcome of the
investigation in order to prevent Shaw from engaging in any
further conduct.  Jehens' investigation consisted of interviews
of ten Lidestri employees over an eight (8) day period.  Within
just one day of completing her investigation, Jehens reported her
findings to Oca, Lidestri's Corporate Human Resources Manager,
who consulted Lidestri's Vice-President, Donna Yanicky, and the
Director of the Warehouse, Lee Biscardi.  That same day, December

22, 2010, these individuals collectively decided to terminate
Shaw's employment based on the sexual harassment allegations
revealed in Jehens' investigation — just eleven days from the
receipt of Jorrin's letter, and a mere seven business days.  This
undisputed evidence is sufficient to support the grant of summary
judgment to Lidestri on Plaintiff's sexual harassment claim.[15]

**B.   Retaliation Claims**

Plaintiff alleges that he suffered retaliation in this case
based on the conduct of another warehouse shift manager, Michael
DiMaio.  Specifically, he claims he was subjected to retaliation
in the following ways: (1) on one occasion taking Plaintiff's
forklift and instructing Plaintiff to get another one; (2) making
statements to other employees requesting that they watch what
Plaintiff was doing and let DiMaio know; (3) using curse words
when speaking to Plaintiff; (4) instructing Plaintiff on one
occasion to go break bins although this was not part of
Plaintiff's typical job duties; (5) by requesting Plaintiff
perform someone else's job on the glass line; and (6) giving

---

[15] To the extent Plaintiff challenges the thoroughness of
Jehens' investigation by claiming that the notes of her interview
with Plaintiff do not accurately reflect his statements to her,
Plaintiff failed to submit a copy of Jehens' notes as evidence in
opposition to the motion and the Court is therefore unable to
evaluate Plaintiff's contention at this time.  Plaintiff's vague
deposition testimony on this issue, standing alone, is
insufficient to overcome the evidence here that Lidestri took
thorough, prompt, and effective remedial measures to put a stop
to Shaw's conduct.

Plaintiff a write-up after Plaintiff failed to work on a Saturday
when he was told to report.  (Lidestri's Statement ¶ 57; Pl.'s
Statement ¶ 57.)

With respect to these claims, Lidestri argues that these
incidents do not constitute adverse employment actions for
purposes of a prima facie case of retaliation.  (Def.'s Br. 16-
17.)  Lidestri also contends that Plaintiff cannot demonstrate a
prima facie case of retaliatory termination because Plaintiff
cannot establish any causal connection between his internal
harassment complaint and DiMaio's conduct.  (Id. at 17.)
Lidestri also points to Plaintiff's own testimony that he had "no
idea" why DiMaio would want to retaliate against him, and that
DiMaio was not even aware of any Plaintiff's complaint to Human
Resources regarding Shaw.  (Id.)

The Court need not address whether the DiMaio's conduct
constitutes an adverse employment action or whether a causal link
exists here because there is absolutely no evidence that DiMaio –
the alleged retaliator – was aware of Plaintiff's protected
activity.[16]  It is undisputed that Plaintiff never had any
conversations with DiMaio about Shaw in general, and specifically
never had any conversations regarding Plaintiff's allegations of

---

[16] The parties do not dispute that Plaintiff engaged in
protected activity as required under the NJLAD for a retaliation
claim by submitting a sexual harassment complaint to Human
Resources regarding Shaw.

sexual harassment against Shaw.  (Lidestri's Statement ¶ 61;
Pl.'s Statement ¶ 61.)  DiMaio testified that other than Jorrin,
DiMaio did not "know of anyone else, [or any] ... names that came
up[.]" (Ex. 11 to Lidestri's Statement, Tr. of DiMaio's Dep.
29:2-5.  DiMaio explicitly stated the he was never told that
Plaintiff made a sexual harassment complaint against Shaw, and
that he did not "even known who was in on the investigation other
than" Jorrin.[17]  (Id. at 29:8-10, 14-17.)  Moreover, Plaintiff
testified that he had "no idea" why DiMaio would want to
retaliate against him, but simply believed that it was based on
his complaint to Human Resources about Shaw.  (Ex. 2 to
Lidestri's Statement, Tr. of Pl.'s Dep. 95:3-5; Pl.'s Statement ¶
63.)  Thus there is no evidence from which a reasonable
factfinder could conclude that DiMaio had knowledge of
Plaintiff's protected activity and therefore, Plaintiff cannot
establish a prima facie case of retaliation under the NJLAD.
Accordingly, this claim fails as a matter of law and Lidestri is
entitled to summary judgment.

---

[17] Plaintiff denies that DiMaio was not aware of any
complaints Plaintiff made against Shaw and argues that DiMaio
knew there was an investigation going on, relying on the
deposition testimony of Jehens.  (Pl.'s Statement ¶ 62.)
However, Plaintiff mischaracterizes Jehens' testimony.  While
Jehens testified that DiMaio knew generally about an
investigation taking place, she specifically noted that she had
not told DiMaio what or who the investigation involved.  (Ex. A
to Pl.'s Statement, Tr. of Jehens' Dep. 72:14-20.)

**V.**   **CONCLUSION**

For the foregoing reasons, Defendant Lidestri Foods, Inc.'s motion for summary judgment is granted.  An Order consistent with this Opinion will be entered.

Dated: March 28, 2013                    s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.